No. 20-16111

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

WAYNE PORRETTI,

*Plaintiff-Appellee*,

v.

JAMES DZURENDA, ET AL.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Nevada

Nos. 2:17-cv-01745, 2:17-cv-02403

Hon. Robert F. Boulware

## APPELLEE'S ANSWERING BRIEF

Samuel Weiss
RIGHTS BEHIND BARS
416 Florida Avenue NW #26152
Washington, DC 20002
sam@rightsbehindbars.org

Jason C. Makris
MAKRIS LEGAL SERVICES, LLC
400 S. 4th Street, Suite 500
Las Vegas, NV 89101
jason.makris@makrislegal.com

*Counsel for Plaintiff-Appellee*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...............................................................................ii

INTRODUCTION ........................................................................................... 1

ISSUE PRESENTED ....................................................................................... 2

PROCEDURAL HISTORY ............................................................................... 3

STATEMENT OF FACTS................................................................................. 5

STANDARD OF REVIEW .............................................................................. 19

SUMMARY OF THE ARGUMENT .................................................................. 20

I.     The District Court Applied the Correct Legal Standard and Correctly Held That Defendants Were Deliberately Indifferent to Porretti's Serious Medical Need ............................................................................................................. 21

II.    The District Court Did Not Violate the Prison Litigation Reform Act...... 31

III.   The District Court Did Not Err in Its Credibility Determinations............. 32

IV.   The District Court Did Not Fail to Sufficiently Consider Public Policy Concerns............................................................................................................ 38

V.    The District Court Did Not Err in Failing to Conduct a *Daubert* Analysis 40

VI.   Defendants' Repeated Failures to Cite to the Record Violate this Court's Rules and Prejudice Porretti.............................................................................. 41

CONCLUSION.............................................................................................. 44

STATEMENT OF RELATED CASES ............................................................... 45

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*ACLU Fund of Michigan v. Livingston Cty.*,
  796 F.3d 636 (6th Cir. 2015).................................................................... 38

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................................. 32

*Arc of Cal. v. Douglas*,
  757 F.3d 975 (9th Cir. 2014)................................................................... 19

*Ariz. Dream Act Coalition v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014).................................................................. 29

*Battista v. Clarke*,
  645 F.3d 449 (1st Cir. 2011) .................................................................... 28

*Cmty. House, Inc. v. City of Boise*,
  490 F.3d 1041 (9th Cir. 2007)............................................................. 2, 19

*Earth Island Inst. v. U.S. Forest Serv.*,
  351 F.3d 1291 (9th Cir. 2003)............................................................. 2, 19

*Edmisten v. Werholtz*,
  287 F. App'x 728 (10th Cir. 2008)........................................................... 38

*Edmo v. Corizon*,
  935 F.3d 757 (9th Cir. 2019)................................................26, 27, 30, 33

*Feldman v. Ariz. Sec'y of State's Office*,
  843 F.3d 366 (9th Cir. 2016)................................................................... 41

*Gomez v. Vernon*,
  255 F.3d 1118 (9th Cir. 2001).................................................................. 31

*Handberry v. Thompson*,
  446 F.3d 335 (2d Cir. 2006)..................................................................... 31

*Heinemann v. Computer Assocs. Int'l, Inc.*,
   319 Fed. App'x 591 (9th Cir. 2009) ................................................................. 41

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) ......................................................................... 38

*Hoffer v. Jones*,
   290 F. Supp. 3d 1292 (N.D. Fla. 2017) ...................................................... 28, 38

*In re First Alliance Mortgage Co.*,
   471 F.3d 977 (9th Cir. 2006) ........................................................................ 32

*Jackson v. McIntosh*,
   90 F.3d 330 (9th Cir. 1996) ................................................................24, 25, 26

*Kirola v. San Francisco*,
   860 F.3d 1164 (9th Cir. 2017) ................................................................. 19, 26

*Kumho Tire Company v. Carmichael*,
   526 U.S. 137 (1999) ..................................................................................... 41

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
   571 F.3d 873 (9th Cir. 2009) ........................................................................ 30

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ........................................................................ 38

*Mitchel v. Gen. Elec. Co.*,
   689 F.2d 877 (9th Cir. 1982) ........................................................................ 42

*Orr v. Plumb*,
   884 F.3d 923 (9th Cir. 2018) .................................................................... 40, 44

*Pau v. Yosemite Park and Curry Co.*,
   928 F.2d 880 (9th Cir. 1991) ........................................................................ 42

*Sammartano v. First Judicial Dist. Court*,
   303 F.3d 959 (9th Cir. 2002) ........................................................................ 38

*Sports Form, Inc. v. United Press Int'l, Inc.*,
686 F.2d 750 (9th Cir. 1982)...................................................................... 19

*Toguchi v. Chung*,
391 F.3d 1051 (9th Cir. 2004)................................................................... 24

*Winter v. NRDC*,
555 U.S. 7 (2008) ..................................................................................... 21

## Other Authorities            Page(s)

Duff Wilson, *For $54 Million, AstraZeneca Settles Case Over Marketing of a Drug*,
N.Y. Times (Apr. 27, 2010) ...................................................................... 40

## INTRODUCTION

Plaintiff-Appellee Wayne Porretti and Defendants-Appellants presented two different stories to the district court. According to Porretti, he is seriously mentally ill and requires treatment with Seroquel and Wellbutrin, which Defendants took away from him without any personalized or medical consideration of the consequences. But according to Defendants, Porretti was malingering and taken off the medications because Defendants believed that he might abuse them. The former story demonstrates deliberate indifference to a serious medical need while the latter story indicates the absence of it.

The district court heard extensive testimony over several hearings and unequivocally credited Porretti's account of events and discredited the account of Defendants. The district court found the medications to be medically necessary for Porretti; that Porretti was suffering gravely without them; that it was not true that Defendants' motive for taking Porretti off the medications was their potential for abuse; that Porretti's medications were discontinued with no monitoring or follow-up and he was not seen by mental health staff until four months later; that the testimony favoring Defendants by the doctor Defendants employed to evaluate Porretti was based on inadequate investigation, was tailored to support Defendants' litigation position, and was not credible; that Porretti was not drug-seeking; that the report of Defendants' witness Dr. Exum was "not based upon the relevant standard

of care or appropriate and accepted methods of psychiatric or psychological evaluation" and was "biased towards the litigation position of [Defendants]"; and that Seroquel and Wellbutrin are not even medications with a high potential for abuse. *See* ER36-48; ER124-33.

A "limited and deferential" abuse of discretion standard governs preliminary injunction appeals and under such a standard affirmance is appropriate. *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1047 (9th Cir. 2007). The district court here "got the law right" and its factual findings are not clearly erroneous, *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1298 (9th Cir. 2003)—in fact, the record supports the district court's conclusions far better than those of Defendants. Without addressing the preliminary injunction factors directly, Defendants have thrown out a series of arguments suggesting that Porretti is not likely to succeed on the merits: that the district court substituted its judgment for that of a jury; that it picked sides in a legitimate dispute of medical opinion; that it did not follow the Prison Litigation Reform Act; and that it made incorrect credibility findings. None of Defendants' objections is correct or is sufficient to demonstrate an abuse of discretion.

## ISSUE PRESENTED

Whether the district court abused its discretion in granting a preliminary injunction to provide psychotropic medications to a seriously mentally ill prisoner

after determining that those medications were medically necessary and had been taken away from him without any medical basis?

## PROCEDURAL HISTORY

Porretti initially filed a complaint asserting an Eighth Amendment violation on March 30, 2018, and the district court dismissed that complaint without prejudice. SER242-58; SER229-41. Porretti filed an amended complaint on April 18, 2018. SER219-228. The district court issued a Joint Consolidation and Screening Order on September 26, 2018, in which Porretti's amended complaint was dismissed without prejudice and the matter was referred to the court's Pro Bono Program. SER206-18. Simultaneously, the district court ordered that a complaint of Porretti's from a separate case be filed as Porretti's second amended complaint ("SAC"). *Id.* The SAC is now the operative complaint in this matter. On December 24, 2018, Porretti filed a motion for appointment of counsel concurrently with a memorandum of points and authorities to support the motion, which the district court subsequently granted. SER160-205; ER118-19; ER120-21. On January 9, 2019, Porretti filed a letter that the district court construed as a motion for preliminary injunctive relief. ER49-50; ER51-52.

On January 18, 2019, the district court held a hearing regarding Porretti's request for injunctive relief and took under consideration Porretti's oral motion for appointment of an expert witness under Rule 706 of the Federal Rules of Evidence.

ER116-17. The hearing was continued to January 29, 2019, for further testimony by Dr. Carla Carroll, a board-certified psychiatrist and employee of the Nevada Department of Corrections ("NDOC"). ER118-119; ER124. A subsequent hearing was held April 9, 2019, so that the court could consider medical records referred to by Dr. Carroll in her expert testimony. ER120-21; ER122-23. After reviewing the records and considering Dr. Carroll's testimony, the district court granted injunctive relief and ordered that experts for each party conduct an independent medical evaluation of Porretti. ER122-23; ECF 124-33. The court appointed Dr. Norton Roitman to conduct an independent medical evaluation and submit an expert report on behalf of Porretti, and Dr. Wade Exum was appointed to do the same on behalf of Defendants. ER37. On June 12, 2019, the court appointed pro bono counsel to represent Porretti. ER207.

On September 19, 2019, the district court conducted an evidentiary hearing regarding each expert's evaluation and expert report. ER220-97. On November 6, 2019, a continued evidentiary hearing was held regarding the district court's request for additional evidence regarding Porretti's past and current course of treatment. ER216-17. At the conclusion of the hearing, the district court stated it would issue a preliminary ruling that Defendants would be required to provide Porretti with Wellbutrin and Seroquel. ER218-19; ER298-324.

On May 31, 2020, the district court issued a detailed written order granting

4

Porretti's request for preliminary injunctive relief and ordering Defendants to file a treatment plan with the court within two weeks. ER36-48. Instead, on June 4, 2020, Defendants filed a notice of appeal to this Court from the district court's order granting injunctive relief and filed an expedited motion for a stay pending appeal ("Motion for Stay") with the district court. ER1-5; SER67-81. On June 5, 2020, the district court ordered Porretti to file a response to Defendants' Motion for Stay; Porretti complied and filed his opposition on June 8, 2020. ER33; SER48-66.

On June 11, 2020, the District Court filed a written order denying the Motion for Stay and ordered that a treatment plan be filed by June 18, 2020. SER41-47. Defendants failed to timely file their treatment plan until June 19, 2020. SER1-2. Despite filing their treatment plan the same day, Defendants asked this Court for an emergency motion to stay the lower court's action. Doc. No. 12. On June 25, 2020, this Court denied the Defendants' requested stay in a motions panel order. Doc. No. 16.

## STATEMENT OF FACTS

Porretti is incarcerated in the NDOC and currently housed at High Desert State Prison ("HDSP"), about an hour outside of Las Vegas, Nevada. Porretti has a long and well-documented history of mental illness, including paranoid schizophrenia, obsessive compulsive disorder, and depression, as well as treatment by medical professionals both in and out of custody. *See* ER126. In 2012, Porretti was arrested and ultimately pleaded guilty to one count of grand larceny. Doc. No. 14, Ex. A. The

Nevada Eighth Judicial District Court sentenced Porretti under NRS 174.063, finding him mentally ill. *See id.* As part of the judgment of conviction, the sentencing court found Porretti "was mentally ill at the time of sentencing" and thus ordered that he was "to receive treatment for his mental illness during the period of confinement in conformity with such treatment as is medically indicated for the defendant's mental illness." *Id.*

Both prior to and once in the custody of the NDOC, Porretti was prescribed Wellbutrin and Seroquel to manage his mental illness. ER124-33; ER141-42. These prescriptions were continued by NDOC physicians. *Id.* In May 2017, the NDOC issued an administrative policy changing its formulary to discontinue prescriptions of Wellbutrin and Seroquel. ER125. Porretti was not monitored after he was taken off these medications, nor was he given any alternative treatment. ER126.

In November 2018—over a year after Porretti's medication regimen was discontinued—Dr. Carla Carroll conducted a single, fifteen-minute telemedicine video conference with Porretti. *See* ER141; SER111-45. As documented by Porretti's prison grievances, Dr. Carroll agreed that Porretti should be prescribed Wellbutrin and Seroquel, but that she could not prescribe them because of the new administrative policy. *See* SER136-39. Dr. Carroll failed to conduct any further visits with Porretti, despite Porretti's continued requests. ER124-33; SER84; *see also* SER143-44; SER97-110. Porretti noted in his requests that he was experiencing

6

a medical emergency because he had begun hearing voices. *See* SER101; *see also* SER97-110 (documenting Porretti's continued requests to be seen by a treating physician).

At the hearing on Porretti's motion for injunctive relief, Dr. Carroll testified about the discontinuation of Porretti's prescriptions. ER137-203. Dr. Carroll, purportedly Porretti's treating physician, testified that she had never met Porretti in-person and had interacted with Porretti only once, virtually, in the November 2018 meeting. ER140. Dr. Carroll testified that the reason Porretti continued receiving Wellbutrin and Seroquel after he entered NDOC custody was that he had a medical need for those medications. ER141-42. She testified that the only reason Porretti's medications were discontinued was the change in prison policy. ER141.

However, despite the long history of prescribed medications to treat Porretti's mental illness, and based upon a short, one-time virtual visit over a year after the medications were discontinued, Dr. Carroll testified that she had concluded that taking Porretti off all medications helping to manage his mental illness was medically appropriate. ER158-59. When pressed as to whether Porretti's custody status played a role in her recommendation to discontinue all medications, Dr. Carroll agreed that continuing Porretti on an antipsychotic would have been appropriate if he self-reported that the medication was helping him and he was not incarcerated. ER161-62. Dr. Carroll even testified that antipsychotic medications

like Seroquel would be medically indicated for treating Tourette's Syndrome, which she diagnosed Porretti with. ER162.

The district court found that Porretti's prior medications were discontinued without a medical basis. ER125-26. It discounted Defendants' argument that the prescriptions had been discontinued because of a fear that they might be subject to abuse, noting that it was "unconvinced of this alleged motivation." ER126. "Defendants had no information that Plaintiff ever abused his medications or misused them as contraband," the court explained. "Plaintiff was not medically monitored when his medications were discontinued although he should have been to provide adequate medical care for his mental health ailments." *Id.*

The district court found that based upon the record and Dr. Carroll's testimony, her "medical opinion that Seroquel and Wellbutrin are not medically necessary for Plaintiff are not credible as compared to the diagnoses and prescriptions in Plaintiff's medical record." *Id.* The district court found that "Dr. Carroll did not have or take the necessary time to complete an adequate and complete examination of Plaintiff and that her records review appears to have been tailored to supporting the Defendants' existing position that Plaintiff does not need the medications he had been previously prescribed." *Id.* The court noted that Dr. Carroll had disregarded all previous medical diagnoses of Porretti in favor of her limited diagnosis. *Id.*

The district court dismissed Dr. Carroll's assertion that Porretti was drug-seeking, finding instead that Porretti's self-reported drug and alcohol abuse was in the distant past. ER126-27. In fact, Porretti had a history of asking to be taken off medications when he was concerned about their addictive potential. ER280. Moreover, the court noted that although Dr. Carroll was supposed to be Porretti's treating physician, she had not seen him again since the November 2018 virtual visit despite Porretti's serious mental illness and his repeated attempts to see her thereafter. ER127.

The district court noted that it had observed Porretti on three occasions, and seen that he "is consistently agitated, pacing, stuttering, [and] involuntarily twitching and frantic." *Id.* Thus, consistent with its own observations and Porretti's extensive medical records, the district court found unpersuasive Dr. Carroll's statement that Porretti lacked "demonstrated observable symptoms of mental illness." *Id.*

Finally, the district court found Porretti's testimony to be credible and substantiated by the medical records. ER127; *see also* SER21-22. This finding included Porretti's "description of his symptoms, including his experiences of paranoia, delusions, and hearing voices." ER127. The court also found that Porretti's "efforts to secure Wellbutrin and Seroquel [we]re based on Plaintiff's bona fide belief that he will be helped by these medications" and that his "medical records support[ed] [the district court's] finding that he [wa]s a credible reporter of his

9

symptoms and the effectiveness of his medications." *Id.*

Despite finding Porretti credible regarding his serious medical needs and finding Dr. Carroll not credible, the district court declined to order outright that Porretti be provided his medication, because it concluded that it could not "just order medication without there being a current evaluation and recommendation from a treatment provider." SER10. Instead, the district court granted preliminary injunctive relief in the form of independent medical evaluations to be completed by experts chosen by each party. *See* ER132.[1]

The district explained that these examinations should entail "a review of the records and [a] physical examination." ER131. The district court rejected Defendants' submission of Dr. Carroll to complete the in-person evaluation of Porretti on their behalf, finding that she would not be appropriate to provide "unbiased witness" testimony. SER30. The district court stated that Defendants' medical expert could not "be an employee of the facility." SER31.[2]

---

[1] Although the district's order requiring them to pay for Dr. Roitman's examination is not at issue in this appeal, Defendants repeatedly argue that it was unfair that they were obligated to pay for Dr. Roitman's examination. *See* OB 33 (referencing "the two IMEs the State has been required to pay for (respectfully in error)"); *see also* OB 5, 6, 19. Defendants appear to be suggesting that they actually *made* the ordered payment. As Defendants' counsel is aware, however, more than a year after the examination, Defendants still refuse to pay Dr. Roitman despite the district court's order requiring them to do so.

[2] Defendants appealed this preliminary injunction to this Court and filed an emergency motion for a stay, just as they have done here. This Court denied the

The parties each proposed experts to conduct the ordered independent medical evaluation of Porretti. On September 19, 2019, the district court heard expert testimony from the parties' respective appointed experts. ER214-15. Defendants' proffered expert was Dr. Wade Exum, who—although not an employee of the NDOC per the district court's requirements—was a contractor whose entire practice consisted of working for the NDOC. ER244. According to his testimony, Dr. Exum did not review or even obtain Porretti's medical records, ER224-25, and he was not aware that Porretti suffered from psychiatric illnesses necessitating the prescription of Wellbutrin and Seroquel, ER227.

Dr. Exum further testified that prescriptions for Wellbutrin and Seroquel would be appropriate for someone diagnosed with severe depression, attention deficit symptoms, and psychotic symptoms. ER228. According to Dr. Exum, he would have no problem with prescribing Wellbutrin and Seroquel for someone exhibiting symptoms of such disorders. ER231. Moreover, Dr. Exum testified that he was not aware of any literature that these medications were abused by individuals to whom they were prescribed. ER232. Dr. Exum explained that the only reason to decline to prescribe such medications where medically indicated was their classification as "nonformulary," a reference to medications not part of a prison's

motion for a stay and then dismissed the appeal as moot. *See Porretti v. Dzurenda* (9th Cir. No. 19-16021).

11

preferred collection of drugs, and the requirement that a review board approve nonformulary medications prescribed by treating physicians. ER242-44. Finally, Dr. Exum opined that absent the formulary restrictions, there were no medical reasons not to prescribe Wellbutrin and Seroquel to Porretti. ER245.

Dr. Norman Roitman was the expert offered by Porretti. Dr. Roitman had a long treatment history with Porretti, dating back to 2004, and had met with him an estimated 15 to 20 times. ER248-49. Dr. Roitman testified that over the course of years of treating Porretti, "the basic symptom complex was persistent." ER250. Between his prior observation of Porretti in 2015 and the in-person examination conducted in support of Porretti's request for injunctive relief, Dr. Roitman testified that Porretti's underlying diagnoses remained immutable. ER260.

Dr. Roitman opined that based upon his treatment of Porretti and a review of his medical history, Porretti suffered from a dysfunction of the brain that manifested in several ways diagnostically. ER251. Dr. Roitman testified these manifestations included feeling "psychotic with voices, hallucination, delusions, and paranoia. Others are hair-trigger movements qualifying for the diagnosis of Tourette's or tix disorder. He also has obsessive compulsive disorder, a high-pitched anxiety, depression and attention deficit disorder symptoms." *Id.* Dr. Roitman explained that the cognitive therapy suggested by Drs. Carroll and Exum would not help Porretti: "The brain-based disorders … such as psychosis, obsessive compulsive disorder, the

fragmented attention, and the tic disorder that he has" "can't be treated with cognitive behavioral therapy." ER255. As Dr. Roitman testified, Porretti suffers from a biological disorder which can be treated only with medication. ER251, ER255.

Dr. Roitman testified that, in his medical opinion, Wellbutrin and Seroquel helped to abate the suffering related to Porretti's mental illness. ER252. Dr. Roitman further testified that in his medical opinion, Porretti's suffering increased when he was deprived of those medications. ER253. Dr. Roitman noted that without the medications, Porretti "is depressed, demoralized. He can't stay on track. He has abnormal involuntary movements that are persistent." ER253-54. Furthermore, according to Dr. Roitman, the deprivation of those medications contributes to Porretti's feelings of anxiety and vulnerability in the prison setting, as he is unable "to track reality combined with the voices." ER254.

Dr. Roitman noted that in his medical opinion, the use of alternative formulary medications to treat Porretti's biological mental illness was disfavored because Porretti had a history of adverse reactions to the suggested medications. ER256, 263-64. As he noted, both Wellbutrin and Seroquel had "unique properties," each providing multiple benefits to Porretti. ER256-57. According to Dr. Roitman, Porretti never exhibited abusive behaviors with those or other medications. ER264. Dr. Roitman testified that, in accordance with his view of the record and medical

literature, Porretti was asking for medications that he knew to help treat his severe mental illness without adverse reactions. ER280. Finally, Dr. Roitman noted that Porretti previously had asked to be taken off abusable medications because Porretti was concerned about their potential for addiction. *Id.*

In its written order granting Porretti's request for injunctive relief, the district court noted that it had provided guidelines for the experts to address, specifically "(a) Plaintiff's current diagnosis including a review of his medical history; (b) whether Plaintiff's prior prescriptions for Wellbutrin and Seroquel are medically necessary given [Plaintiff's] current diagnosis; (c) the existence and efficacy of potential alternative medications and/or treatments; and (d) requirements for Plaintiff's future care." ER37. The district court found that "Dr. Exum's report and proposed treatment plan are not credible as they are not based upon the relevant standard of care or appropriate and accepted methods of psychiatric or psychological evaluation." ER38. The court also noted that Dr. Exum's four-page report failed to meet the criteria the court had explicitly ordered. ER39. For instance, the report did not discuss Plaintiff's prior experience with Wellbutrin and Seroquel, despite acknowledging such information was crucial in providing an accurate professional diagnosis. *Id.* And Dr. Exum gave no explanation for his "failure to undertake such a review and analysis." *Id.* As the district court further found:

> Dr. Exum diagnosed Plaintiff with substance use disorders, as well as Antisocial Personality Disorder traits and Borderline Personality

> Disorder traits and recommended no medication without considering and reviewing the literature on such medication, without considering Mr. Porretti's prior experience with the medications at issue, and without reviewing Plaintiff's extensive (approximately 700 pages) medical records — a review and evaluation that is acknowledged in the profession as crucial to a full and complete diagnosis.

*Id*. Furthermore, the Court found that Dr. Exum's diagnosis and proposed treatment plan of cognitive behavioral therapy or dialectical behavioral therapy lacked credibility based upon the appropriate professional standards. ER41. In support of this finding, the court noted that Dr. Exum had failed to read or review any of the previous records by prior medical professionals with respect to the effects of various treatments of Porretti's mental health issues; Dr. Exum's evaluation was based upon a single interview with Porretti; and Dr. Exum relied exclusively on Porretti's self-report of his medical history in making diagnoses for Porretti, despite Dr. Exum's testimony that Porretti was a very poor historian. *Id.* Moreover, the court found that Dr. Exum's testimony, like Dr. Carroll's opinion, was "partial and biased testimony designed to support the litigation position of the Defendants." *Id.*

In contrast, the court credited the expert report and medical opinion of Dr. Roitman based upon the material differences in the scope and detail provided by Dr. Roitman compared with Dr. Exum. ER38. Unlike Dr. Exum, Dr. Roitman complied with the district court's order as to the content of the expert report. ER38-39. Indeed, Dr. Roitman submitted a twenty-page report, which the district court found detailed:

> potential limitations, the sources of information used to comport the

> report, Plaintiff's mental health history, including a psychiatric history that considered the diagnoses and prescribed treatment made by former providers, family history, medical history, substance use history, [Dr. Roitman's] mental status examination, [his] diagnostic impression, and a ten-page discussion of [his] findings, including consideration of the assertion made by Defendants that Seroquel and Wellbutrin are prone to abuse and the reasons why the literature does not support such a finding, and why alternative treatments are not appropriate for Plaintiff.

*Id.* Furthermore, Dr. Roitman relied upon "psychiatric history questionnaires and a symptom checklist administered to Plaintiff, a two-and-a-half hour examination, records for prior psychiatric evaluations and treatment at the Lakes Crossing forensic facility, documentation pertaining to a prior hospitalization at Southern Nevada Adult Mental Health Services psychiatric hospital, competency evaluations of psychiatric and psychological examiners, and recollections of treatment and psychiatric progress notes during his direct treatment of Porretti to reach his conclusions." ER39. Importantly, unlike Dr. Carroll or Dr. Exum, Dr. Roitman "relied upon an evaluation of the current literature and studies on the relevant medication, and, importantly, Mr. Porretti's documented history with them." *Id.*

Additionally, the district court found Dr. Roitman followed the court's directive when he concluded that Porretti "'has a bona fide neuropsychiatric illness that can be treated by … Wellbutrin and Seroquel, at the doses he was prescribed before.'" ER40. Dr. Roitman testified that even if these medications were discouraged for use by the general inmate population, Wellbutrin and Seroquel would still be indicated for Porretti because of his demonstrated success with their

use previously and his experience of "severe side effects to the other antipsychotic indicated for his psychotic symptoms, paranoia, tics, insomnia and depression." *Id.*

The court also found that Defendants' "intentional and unjustified discontinuation of these medications in light of" an extensive and well-documented mental illness had exacerbated Porretti's condition, as demonstrated by "the many and increasingly frantic filings he has made with this Court." ER45-46. Porretti's worsening condition is further reflected in the observations submitted by NDOC staff. ER46.

In granting injunctive relief, the district court ordered Defendants to submit a treatment plan within fourteen days for the court's approval and to be ready for immediate implementation. ER48. Instead, on June 4, 2020, Defendants filed their Motion to Stay and asked for a ruling from the district court on or before June 11, 2020. SER67-81. On June 11, 2020, the district court issued an order denying Defendants' motion. SER41-47. In denying the request, the district court found that Defendants failed to demonstrate they would suffer any irreparable harm absent a stay from the district court. SER43. The district court further found that the NDOC and its representatives could easily comply with any court order to provide Wellbutrin and Seroquel, noting that the NDOC had previously been able to provide Porretti with those medications. SER44. Additionally, the court found that Defendants had been unable to demonstrate that they would be successful on the

merits. SER45.

The court referenced Defendants' continued mischaracterization of the district court's previous rulings:

> [T]he Court reiterates once more that it has made explicit and detailed legal findings and credibility determinations as to the testimony and opinions of Dr. Carroll, Dr. Exum, and Dr. Roitman in its prior orders. Defendants appear to repeatedly mischaracterize this Court's rulings as based upon a difference of medical opinions. This misstates the Court's holdings. The Court found that Defendants' experts were not credible and provided biased testimony. By contrast, as stated in its most recent order, the Court found Dr. Roitman to be credible. The Defendants' Motion offers no basis for the Court to alter its findings. In short, Defendants have presented no argument or evidence to warrant reconsideration of the Court's finding that Plaintiff, and not Defendants, is likely to succeed on the merits, which necessarily precludes a finding that Defendants have satisfied their burden for a stay.

SER46 (citations omitted).

In denying Defendants' Motion for Stay, the court extended the time for filing a treatment plan for the court's approval to June 18, 2020. *Id.* Defendants missed their deadline, filing their proposed treatment plan on June 19, *see* SER1-2, and simultaneously sought relief in this Court on an emergency basis. This Court denied the request for an emergency stay. Doc. No. 16.

On July 29, 2020 the district court ordered a hearing because Defendants had refused to enter a treatment plan that actually provided the medications the court had ordered, which it termed "a blatant violation of the Court's order" as well as "an unfortunate and continuous pattern in this case of failing to provide adequate medical

treatment to Mr. Porretti." SER259. The court noted that if Defendants do not provide Porretti with the medication by the date of the hearing, it "will impose sanctions." SER260.

## STANDARD OF REVIEW

A "limited and deferential" abuse-of-discretion standard governs preliminary injunction appeals. *Cmty. House*, 490 F.3d at 1047. Review of a preliminary injunction is "much more limited than review of an order involving a permanent injunction." *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 752 (9th Cir. 1982). "A district court abuses its discretion when its decision relies on an erroneous legal standard or clearly erroneous finding of fact." *Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (internal quotation marks omitted). A factual finding constitutes clear error if it is "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Id.* at 983-84 (internal quotation marks omitted). "[T]rial court credibility findings," this Court has stated, "are entitled to special deference." *Kirola v. San Francisco*, 860 F.3d 1164, 1182 (9th Cir. 2017). This Court "will not second guess whether the court correctly applied the law to the facts of the case, which may be largely undeveloped at the early stages of litigation. As long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Earth Island Inst.*, 351 F.3d at 1298.

**SUMMARY OF THE ARGUMENT**

The district court did not abuse its discretion in granting a preliminary injunction to provide a seriously mentally ill patient the only medications that worked for him after finding that Defendants had no medical basis to deprive him of those medications. It made no errors of law, and none of its factual findings were clearly erroneous. In their opening brief, Defendants do not methodically address the four preliminary injunction factors—failing to even mention three of the four— or identify any clear errors in the district court's analysis of those factors, but instead throw out a series of legal arguments as to why Porretti is unlikely to succeed on the merits to see if one sticks. None do.

Defendants largely ignore the deferential standard of review and attempt to relitigate the likelihood of success prong as if this Court's review were *de novo*, but even under such a standard Defendants' arguments fail. Defendants argue this was a mere medical disagreement, but the district court found that Defendants had made no medical determination in deciding to take Porretti off his medication and that the purported medical justification was made post hoc to rationalize an administrative decision. They argue that the district court violated the Prison Litigation Reform Act, when the Act does nothing to limit injunctions in this context. While Defendants argue that the district court erred in finding Porretti and his doctor credible while finding Defendants' witnesses not credible, its basis for doing so was well-supported

in the record and the district court is owed significant deference on credibility determinations. The district court did not fail to consider the policy concerns behind denying Porretti medication, as Defendants allege, but instead considered and rejected Defendants' factual premises animating those concerns—factual determinations owed great deference. The district court did not err in failing to make *Daubert* determinations because no party, Defendants included, filed a *Daubert* motion; even if a *Daubert* motion had been made, no party questioned that the three expert witnesses, two of whom testified for Defendants, were qualified to testify as to their area of expertise. At the base of each of these arguments is either a misinterpretation of the law or an attempt to relitigate the district court's factual findings, which were well-documented and are not amenable to reconsideration on appeal absent clear error.

## ARGUMENT

I.  **The District Court Applied the Correct Legal Standard and Correctly Held That Defendants Were Deliberately Indifferent to Porretti's Serious Medical Need.**

The district court did not err in its analysis of the preliminary injunction standard. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Defendants do not

21

challenge the district court's ruling on any of the four factors except occasionally mentioning throughout their opening brief, under a variety of legal theories, that Porretti is not likely to succeed on the merits.

Defendants are incorrect in arguing that Porretti is unlikely to succeed on the merits because the district court's ruling was narrowly focused on his medications and did not consider whether "NDOC treatment as a whole" demonstrated deliberate indifference. OB 24. The district court found that Porretti was receiving "minimal or no treatment at all" and was not even receiving the cognitive and behavioral therapy recommended by Dr. Exum. ER46.[3] It noted NDOC staff have documented Porretti's worsening symptoms. *Id.* The district court repeatedly acknowledged early in the litigation that there might be treatment short of Wellbutrin and Seroquel that brought Defendants to the constitutional minimum, but ultimately found that there was no evidence to support that Defendants had pursued this alternative. *See, e.g.,* ER175–76 ("even if I were to find through some process that you had the diagnosis that you believe you have, it doesn't mean that I would necessarily order specific

---

[3] While Defendants repeatedly characterize the district court's ruling as inappropriately deciding between expert medical opinions, *see, e.g.,* OB 31 ("The NDOC contends that recommending cognitive therapy for someone that medication has not necessarily been successful for more than twelve years is a different school of thought and thus a difference of medical opinion that does not amount to indifference."), Defendants followed neither of the doctors' recommendations, providing Porretti neither the medications he requires nor cognitive behavioral therapy. ER46.

medication. … I'm not in a position as a judge to necessarily decide what medication you should receive. … it would be potentially whatever medication would be prescribed by [for example,] an independent consultation").

Defendants also consistently mischaracterize the court's ruling, for instance in arguing, "While the district court now finds the decision to ban Wellbutrin and Seroquel due to their high potential for abuse unfounded, the NDOC personnel was prescribing medication based upon real time changing conditions of Porretti and the institution." OB 32. The district court's holding was not that Defendants rescinded Porretti's medication for a reason that later turned out to be "unfounded;" instead, the district court found that the record demonstrated that the proffered reason was not the actual basis for the decision but instead a post hoc justification for a decision made on other grounds. *See* ER126; *see also* ER305 (the court explaining that it was "shocked" by Defendants' witnesses lack of credibility). Defendants were not, therefore, "prescribing medication based upon real time changing conditions of Porretti" but instead simply cutting off his medication with no monitoring, no replacement medications for months, and no individualized care. The factual findings underlying this judgment were not clearly erroneous, and the district court did not err in holding that they established a likelihood of success on the merits.

In arguing that Porretti is unlikely to succeed, Defendants also consistently conflate two different types of "medical disagreement." They correctly point out that

a mere disagreement of medical opinion between two legitimate alternatives does not constitute deliberate indifference. OB 33 (citing *Toguchi v. Chung*, 391 F.3d 1051, 1059 (9th Cir. 2004); *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). That kind of medical disagreement, however, is between the incarcerated plaintiff and the doctor who made the medical decision at issue. *See Toguchi*, 391 F.3d at 1059 (holding that plaintiff's disagreement with the treating doctor's provision of medical care was a "difference of medical opinion, which cannot support a claim of deliberate indifference"); *McIntosh*, 90 F.3d at 332 ("where a defendant has based his actions on a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances, plaintiff has failed to show deliberate indifference, as a matter of law").

While there is "medical disagreement" in this case as well, here it is between two competing medical experts selected to evaluate Porretti *after* the district court had already found that the medical decision-maker who took Porretti off his medications did so without any medical basis. The district court discounted Defendants' argument that the prescriptions had been discontinued because of a fear that they might be subject to abuse, noting that it was "unconvinced of this alleged motivation" because there was nothing in the record giving Defendants a reason to believe that "Plaintiff ever abused his medications or misused them as contraband." ER126. And because the district court found that "Plaintiff was not medically

24

monitored when his medications were discontinued although he should have been to provide adequate medical care for his mental health ailments," *id.*, it concluded that Defendants' original decision to discontinue the mediations lacked a medical justification—the district court did not simply disagree with a medical decision Defendants had made. ER45-46. Because those factual findings were not clearly erroneous, the district court did not abuse its discretion in holding that taking Porretti off those medications, and keeping him off them, demonstrated deliberate indifference.

Yet Defendants criticize Dr. Roitman for not testifying that "*Dr. Exum's* belief that the medications were not needed or appropriate violated the community standard of care or rose to the level of medical indifference." OB 31 (emphasis added). Dr. Exum was not Porretti's treating physician or the medical decision-maker responsible for taking Porretti off his medications. While Dr. Exum's testimony—which the district court found lacked credibility—was presented to help elucidate the appropriateness of Porretti's requested relief, it is not medical disagreement with Dr. Exum that is relevant.

Because the district court concluded that Defendants' decision to discontinue Porretti's medications was not based on a medical judgment at all, it was well within its authority to find that Defendants' behavior constituted deliberate indifference. While Defendants cite *McIntosh* for the principle that mere medical disagreement is

not actionable, in that case the defendants—prison medical staff—lost their appeal because the prisoner had raised a genuine dispute of material fact as to whether his failure to receive a kidney transplant was attributable to personal animosity, not legitimate medical judgment. 90 F.3d at 332. Defendants cannot distinguish *McIntosh* because Defendants have not even argued that the district court's factual finding that there was no legitimate medical reason for taking Porretti off his medication was clearly erroneous.

Defendants attempt to distinguish *Edmo v. Corizon*, a case in which an incarcerated plaintiff seeking gender reassignment surgery presented evidence of deliberate indifference to her gender dysphoria, which the state cast as a mere disagreement between her and the prison's doctors. 935 F.3d 757, 787 (9th Cir. 2019). But *Edmo* directly controls this case. This Court affirmed the district court's preliminary injunction ordering the surgery, holding that it was "not a case of dueling experts" because the district court had found the plaintiff's medical experts credible but found the defendants' experts not credible. *Id.* The district court "did not clearly err in making its credibility determinations, so it is not [this Court's] role to reevaluate them." *Id.* Credibility determinations of that nature "are entitled to special deference." *Kirola*, 860 F.3d at 1182.

Defendants attempt to distinguish *Edmo* because surgery is a one-off fix while this treatment plan would continue indefinitely and because the district court "never

26

made a factual finding that the NDOC treatment as a whole is unacceptable." OB 26. Both are simply untrue, in addition to being irrelevant to whether *Edmo* controls. The preliminary injunction will expire after ninety days, *see* 18 U.S.C. § 3626(a)(2), and the district court found the NDOC treatment as a whole unconstitutional, s*ee, e.g.*, ER45-46 (finding that "unjustified discontinuation of these medications in light of Plaintiff's well-documented mental illness constitutes deliberate indifference, which has resulted in an exacerbation of Plaintiff's condition"); *id.* ("[T]his deliberate indifference has continued in that Mr. Porretti has not even been provided regular cognitive or behavioral treatment as recommended by NDOC's own doctors [and] without an injunction in this case, the record supports the Court's finding that Mr. Porretti would continue to receive minimal if any treatment at all.")

Defendants also attempt to distinguish *Edmo* by stating that following the district court's order here would involve violating their medical ethics. OB 26. This argument contains no citations, either to legal authority or to the record. Hundreds of lawsuits are filed every year from prisons and jails arguing that the plaintiff has received unconstitutionally inadequate medical treatment and seeking injunctive relief. Defendants in these cases naturally argue that the requested relief is not necessary. Yet when plaintiffs win these cases, courts require that the defendants provide medical treatment that they had previously argued to be unnecessary without any suggestion that they are somehow compromising the medical ethics of the

27

defendants. *See, e.g.*, *Battista v. Clarke*, 645 F.3d 449, 455 (1st Cir. 2011) (ordering medical treatment that prison defendants argued was inappropriate because it would cause security concerns); *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1306 (N.D. Fla. 2017) (entering a preliminary injunction ordering the provision of medications to prisoner patients that prison defendants had deemed unnecessary).

Defendants find nowhere in this subgenre of constitutional litigation any suggestion of a threat to the medical ethics of the defendants who must comply with court orders requiring them to provide treatment that they had earlier claimed was unnecessary. In theory, this case could plausibly be an outlier if medical staff believed that the medication might be harmful to Porretti, but they do not make that argument tand there is no record support for that proposition. *See, e.g.*, ER245 (Defendants' expert Dr. Exum testifying that there are no medical reasons to not prescribe Wellbutrin and Seroquel to Porretti).

Defendants' novel argument is particularly unpersuasive here because the district court went to great lengths to not rely on its own judgment in ordering that Porretti's prescriptions be restored. Instead of ordering outright that Porretti be given his medications when Dr. Carroll's incredible testimony contradicted Porretti's medical records, the district court explained that it would be inappropriate for it to "order particular medications without a doctor's evaluation" and required that Porretti receive a medical examination from a neutral expert. SER9-10; *see also*

ER204-06. When Defendants objected that Porretti's previous doctor might be biased, the court permitted one of Defendants' experts to examine him as well. SER10-11; SER30-31. But Defendants' expert, in contravention of the district court's order, relied on a single, brief discussion with Porretti and failed to review his medical records or discuss the nature of the medications at issue and Porretti's prior experience with them. ER39. "While acknowledging the crucial aspect of such information to an accurate professional diagnosis and to addressing the issue before the Court, Dr. Exum could offer no credible explanation for his professional failure to undertake such a review and analysis." *Id.* Defendants had two opportunities—with Dr. Carroll and later Dr. Exum—to provide credible testimony regarding Porretti's medical needs, and both doctors failed to do so, while Porretti's expert Dr. Roitman did.

In a section that contains no citations to law or the record, Defendants argue that the preliminary injunction here does not preserve the status quo and is therefore mandatory, not prohibitory. OB 23–24. This is incorrect. The status quo is the "last, uncontested status" preceding the dispute. *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1060-61 (9th Cir. 2014) ("[T]he status quo refers to the legally relevant relationship between the parties before the controversy arose[.]") (internal quotation marks omitted). Before the controversy arose, Porretti was receiving Seroquel and Wellbutrin as prescribed by NDOC physicians. ER43. Because Porretti sought

29

injunctive relief preventing the Defendants from taking action to alter the status quo, the district court correctly found the injunction to be prohibitory. *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009).

Defendants' argument is also irrelevant: Although the district court found the injunctive relief to be prohibitive, it nonetheless applied the heightened standard required for mandatory injunctions in case the relief granted were considered new treatment. ER43. Under this heightened standard of review, the district court still found that Porretti met his burden. ER43; *see also Edmo*, 935 F.3d at 784 n.13 (noting that this Court would have affirmed a mandatory preliminary injunction in analogous circumstances).

Defendants also suggest that the amount of time that passed between Porretti filing his complaint and seeking a preliminary injunction suggests he is unlikely to succeed on the merits. OB 21. Porretti is incarcerated and seriously mentally ill, has been deprived of his antipsychotic medications, and for almost the entirety of this case was litigating *pro se*. It is unreasonable and inappropriate for Defendants to deprive Porretti of the medications he needs to function and then, when he sues *pro se* from his prison cell to get them back, to argue that this Court should penalize him for not litigating this case efficiently enough. The length of the litigation also reflects the district court's thoroughness and repeated attempts to permit Defendants to put

30

in the record a credible medical opinion supporting their argument that Porretti did not require his medications, which they nonetheless failed to do.

## II. The District Court Did Not Violate the Prison Litigation Reform Act.

Defendants argue that the Prison Litigation Reform Act (PLRA) "Further Limits the Courts [sic] Injunctive Powers" through its provision that any preliminary injunction be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." OB 23; 18 U.S.C. § 3626(a)(2). The PLRA does limit preliminary injunctive relief, but not in the way that Defendants suggest. For example, it overrides the supplemental jurisdiction statute, 28 U.S.C. § 1367, and means that federal courts cannot provide prospective relief under state law. *See Handberry v. Thompson*, 446 F.3d 335, 344 (2d Cir. 2006). It also limits the ability of courts to enter prison release orders. 18 U.S.C. § 3626(a)(3). It does not, however, "substantially change[] the threshold findings and standards required to justify an injunction." *Gomez v. Vernon*, 255 F.3d 1118, 1129 (9th Cir. 2001). As to that, the provision "merely codifies existing law [governing injunctive relief] and does not change the standards for determining whether to grant an injunction." *Id.* The PLRA therefore does not affect the injunction entered here.

Although Defendants invoke the first lines of 18 U.S.C. § 3626(a)(2), which do not affect the scope of the district court's relief, they ignore the following lines,

which do. 18 U.S.C. § 3626(a)(2) requires that all preliminary relief expire after ninety days. Defendants not only fail to cite this obviously relevant fact but also falsely claim that the preliminary injunction requires them to administer "medication for an *ad infinitum* amount of time." OB 26; *see also* OB 20 (arguing the district court "has entered an injunctive order that has an *ad infinitum* and overly broad effect"). Because of the very same provision of the PLRA they invoke, the injunction does no such thing.

## III. The District Court Did Not Err in Its Credibility Determinations.

Defendants quote uncredited sources for the propositions that a district court's credibility determinations "are entitled to special deference," but also that "[e]ven under the de novo standard, the court must draw all reasonable inferences in favor of the nonmoving party, keeping in mind that credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." OB 34. These quotations are contradictory, and the latter, which Defendants argue is the controlling standard, is inapplicable. Defendants appear to be quoting *In re First Alliance Mortgage Co.*, 471 F.3d 977, 991 (9th Cir. 2006). But both *In re First Alliance* and the rest of the authority Defendants subsequently cite deal exclusively with Rule 50 motions for judgments as a matter of law. OB 45; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). These cases are inapposite. While on a Rule 50 motion it is indeed the case that

judges cannot make credibility determinations and must make inferences in favor of the nonmoving party, the procedural posture here is different. *Id.*

In evaluating a motion for injunctive relief, a district court may and must evaluate credibility, and those credibility determinations are reviewed for clear error. *See Edmo*, 935 F.3d at 787 (reviewing expert medical testimony in a prison conditions case and explaining "the district court did not clearly err in making its credibility determinations, so it is not our role to reevaluate them").

The district court appropriately evaluated the credibility of four witnesses who provided inconsistent testimony, ultimately finding Porretti and Dr. Roitman credible and Doctors Carroll and Exum not. None of these determinations was clearly erroneous.

Defendants argue that the district court should have found Dr. Carroll credible because, despite not being Porretti's treating physician, she evaluated him in-person and reviewed his medical records. OB 35. The first two claims are incorrect. Dr. Carroll never evaluated Porretti in-person, but she was his treating physician. ER127 ("Dr. Carroll has never interacted with Plaintiff in person."); *see also* ER178-79; ER127 ("Dr. Carroll has been Plaintiff's treating physician for several months."). And while she claimed to have reviewed Porretti's medical records, her conclusions clashed with the repeated diagnoses of his previous doctors, and she gave no explanation as to why the insights gleaned from a brief virtual visit overrode

numerous evaluations from Porretti's past made over many years. She also testified that Porretti had no observable symptoms of mental illness, when during court hearings the district court "observed that Plaintiff is consistently agitated, pacing, stuttering, involuntarily twitching and frantic," ER127, all of which were consistent with the diagnoses in his medical records. The district court was also surprised to learn, months after Dr. Carroll's testimony, that although she was Porretti's treating physician she had still never seen him despite his constant pleas for treatment. *Id.* While Defendants argue that the district court erred "because it made only a general credibility finding without providing any reviewable reasons why it found Dr. Carroll incredible," the district court methodically explained its numerous bases for finding Dr. Carroll incredible, including but not limited to those explained above. ER126-27.

Defendants point to the district court's January 2019 statement that it found Dr. Carroll credible, implying that the district court's reasoning was muddled because later the court found her not credible. OB 35. Defendants mistake thoroughness for contradiction. At the January hearing, the district court understood Dr. Carroll's testimony to contradict a lengthy collection of medical records, most of which the court did not yet have access to. The court therefore admitted at the hearing that it did not know how to weigh the conflicting evidence because Dr. Carroll was a licensed doctor just as Porretti's previous doctors were. ER184 ("I

could simply rely upon what are fairly clear and explicit prior diagnoses. …. I accept both [Dr. Carroll's and the previous diagnoses] as being credible, but I have to have some way to resolve this."). Upon later obtaining Porretti's medical records and analyzing them, the district court found that Dr. Carroll's testimony was not credible because she had barely interacted with Porretti, her claims wildly contradicted his voluminous medical records, and her evidence-free assertions supported the litigation position of her employer. SER9. Defendants paint the district court's reasoning as confused, but the district court was simply admitting in January that it was not a medical expert and required more evidence. The district court's thoughtful and extensive evaluation of Dr. Carroll's testimony and its ultimate conclusion that she was not credible warrant deference.

At the conclusion of the two independent medical examinations, the district court found Dr. Roitman credible and Dr. Exum not, ER41, findings that were also not clearly erroneous. The court explained in meticulous and persuasive detail why Dr. Roitman's report was credible and Dr. Exum's was not. Dr. Roitman's report was twenty pages long, detailed the information used to compile it, explained its potential weaknesses, and drew on Dr. Roitman's 15 to 20 previous appointments with Porretti. ER40.[4] Dr. Roitman extensively evaluated the literature on whether

---

[4] Defendants state that "Dr. Roitman previously evaluated Porretti on two different occasions," OB 4, but he had examined him at least 15 times, ER40.

Seroquel and Wellbutrin were subject to abuse, finding that they were not. ER38. He also explained why alternative treatments were not appropriate for Porretti. *Id.*

Dr. Exum, by contrast, submitted a four-page report. It did not include any information on Wellbutrin and Seroquel and whether they would benefit Porretti, as the court had explicitly ordered. ER39. The report also did not discuss Porretti's previous experience with those medications as discussed in medical records. *Id.* It later became clear that Exum had not obtained or even requested Porretti's medical records. *Id.* His report stated that Porretti was a "poor historian," making it unclear what information Dr. Exum purported to rely on given that he met Porretti once briefly and did not review his medical records. *Id.* Also, while the district court required Defendants to select a doctor who was not an employee of the NDOC, they selected an independent contractor who receives 100 percent of his business from NDOC. ER38. These were all more than adequate bases to support the district court's credibility findings.

The court did not clearly err by mentioning Dr. Exum's bias while not mentioning any possible bias of Dr. Roitman's. OB 36. Dr. Exum receives 100 percent of his income from NDOC. ER38. He conducted his testimony in this case over the phone from an NDOC facility. ER247. His selection as Defendants' witness was particularly striking given that, out of fears of bias after Dr. Carroll's testimony, the court ordered that Defendants select an expert who was not an employee of the

36

NDOC. SER31. Instead of following the spirit of the court's order, Defendants found a loophole.

In contrast, there was no reason to believe Dr. Roitman was biased. Unlike Dr. Carroll and Dr. Exum, he was not testifying in favor of his employer.[5] While Defendants mention that in the past he had worked for Porretti's attorney as a defense-side expert on reduced culpability, on the most recent occasion Dr. Roitman was retained by Porretti's defense counsel he determined that Porretti did *not* have reduced culpability that excused his conduct. ER272. He also testified in the past that Porretti had malingered in an attempt to avoid criminal culpability. ER267. There is therefore strong evidence that Dr. Roitman does not mechanically repeat Porretti's litigation position even when he may have had a financial incentive to do so, which he did not do in the present case. Furthermore, Defendants' complaint that the court dismissed Defendants' expert testimony because of their financial bias largely reverses the order of causation, as the district court found Carroll and Exum's testimony unsupported and implausible on the merits and Porretti and Dr. Roitman's consistent and supported by years of medical records; its mention of bias was brief

---

[5] Defendants refer to the three doctors, two of whom were chosen by Defendants and make their living exclusively by working for NDOC and one of whom was chosen by the court and works independently of the parties, as "handpicked experts" to favor Porretti. OB 31.

and largely meant to explain Defendants' implausible testimony. ER38. These were methodical and thoughtful conclusions, not clearly erroneous ones.

## IV. The District Court Did Not Fail to Sufficiently Consider Public Policy Concerns.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959 (9th Cir. 2002)); *see also Hernandez v. Sessions*, 872 F.3d 976, 1000 (9th Cir. 2017). This extends to the constitutional rights of people in prison. *See, e.g.*, *ACLU Fund of Michigan v. Livingston Cty.*, 796 F.3d 636, 649 (6th Cir. 2015) ("When a constitutional violation is likely … the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights.") (internal quotation marks omitted); *Edmisten v. Werholtz*, 287 F. App'x 728, 735 (10th Cir. 2008) (holding that the public interest weighed in favor of prisoners receiving medical care because "the public has an interest in protecting the civil rights of all persons under the Constitution"); *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1304 (N.D. Fla. 2017) (holding in a case involving the failure to provide necessary medication that "the public is undoubtedly interested in seeing that inmates' constitutional rights are not violated."). The public interest therefore lies in Porretti receiving constitutionally adequate medical care.

Defendants argue that the district court failed to adequately consider the safety concerns created by one patient receiving Seroquel. OB 38. The district court did consider them, however; it simply did not adopt the factual findings for which Defendants argued. The court credited Dr. Roitman's report stating that there was no science to validate the fear that Seroquel and Wellbutrin were prone to abuse. ER40 The district court did not find credible Dr. Carroll's testimony stating that these drugs had a high potential for abuse in the prison system or that Porretti was drug-seeking. ER127. And while Defendants argue that denying Porretti the medications he has been begging to obtain for three years was to his benefit because those medications could present a security risk, OB 38, Dr. Roitman in his report, under seal, wrote that a genuine security threat could result from *failing* to treat Porretti because his tics and impulsivity put him at risk for harassment by other prisoners

Defendants also cite to two news articles on lawsuits concerning Seroquel: one involves the illegal marketing of it for off-label uses and one involves a class action lawsuit that it might give certain patients diabetes. OB 39. Defendants did not appear to provide these articles to the district court or to have argued that providing one patient with Seroquel will result in an outbreak of diabetes or illegal marketing at the prison. It is therefore unclear what these articles have to do with the relevant public policy concerns. Even were these concerns somehow relevant, the very news

article to which Defendants cite regarding off-label uses mentions that the Seroquel off-label settlement was much smaller than an analogous settlement involving Zyprexa, the drug that Defendants provided to Porretti in place of Seroquel. *Id.* (citing Duff Wilson, *For $54 Million, AstraZeneca Settles Case Over Marketing of a Drug*, N.Y. Times (Apr. 27, 2010),  https://tinyurl.com/y367a9nm); ER157.

## V.    The District Court Did Not Err in Failing to Conduct a *Daubert* Analysis.

Defendants' *Daubert* argument is made for the first time on appeal and is therefore forfeited. *Orr v. Plumb*, 884 F.3d 923, 932 (9th Cir. 2018). It is also difficult to understand. The court did not entertain *Daubert* motions because no party filed one, Defendants included. Three doctors testified and no party questioned that all had the requisite qualifications to testify as to Porretti's medical issues. *See, e.g.*, ER179-82 (district court accepting Dr. Carroll as an expert witness). The district court was aware of their qualifications and background and did not discount any witness's testimony on those grounds. *Id.*

Defendants argue that the district court erred in making its credibility determinations without "expert reports" or "legal analyses," but they do not explain how those reports would differ from the reports the doctors submitted or what benefit "legal analyses" would provide the district court.[6] Defendants appear to suggest that

---

[6] Defendants also repeat their claim that the court should not have made credibility determinations "which is generally the province of a jury or fact finder," when on a

they were prejudiced by Porretti's failure to make a *Daubert* challenge, which their "legal analyses" would have defeated, but they do not explain how this could be so given that their experts were discounted because their testimony was incredible, not because their methods lacked reliability or any of the other *Daubert* factors. Defendants cite *Kumho Tire Company v. Carmichael* for the proposition that "it is generally appropriate to avoid unnecessary reliability proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted," but that is precisely what occurred here. 526 U.S. 137, 152 (1999).

## VI. Defendants' Repeated Failures to Cite to the Record Violate this Court's Rules and Prejudice Porretti.

Defendants' opening brief makes many factual assertions without citing to their appendix or, at times, anything. *See* 9th Circuit Local Rule 28-2.8 ("Every assertion in briefs regarding matters in the record shall be supported by a reference to the location in the excerpts of record where the matter is to be found"). The Ninth Circuit has held that a party's failure to comply with appellate briefing rules results in the waiver of unsupported arguments or even, in extreme cases, dismissal of the appeal. *See, e.g.*, *Heinemann v. Computer Assocs. Int'l, Inc.*, 319 Fed. App'x 591, 596 (9th Cir. 2009) (declining to review issues that were not presented with an

---

motion for preliminary injunction the court *is* the fact finder. *See supra* Section III; *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 375 n.6 (9th Cir. 2016).

adequate record for review); *Pau v. Yosemite Park and Curry Co.*, 928 F.2d 880, 888-89 (9th Cir. 1991) (declining to review trial court's exclusion of evidence because of Appellants' failure to cite to the record). This Court has explained that a party's "failure to refer to the record works a hardship not only on this court, but also on the opposing litigants. We should not expect a party to expend large amounts of time and money sifting through the trial record in search of support for an opposing party's allegations." *Mitchel v. Gen. Elec. Co.*, 689 F.2d 877, 879 (9th Cir. 1982) (per curiam). Procedural compliance is more than a mechanism for efficiency— disregard of Fed. R. App. P. 28(e) prejudices Porretti by forcing him to guess the basis of Appellants' evidentiary disputes. This failure is particularly harmful here because Porretti was operating *pro se* as a seriously mentally ill incarcerated plaintiff without his medication for the vast majority of this litigation. Defendants have forced Porretti and his newly arrived counsel to guess at what in the record they are referencing, warranting waiver of those claims.

This is not nitpicking. Many of the most critical factual assertions Defendants make are miscited or never cited. For example, their statement that "case workers … found Porretti guilty of hoarding and selling these medications" and that their public safety concern "is based upon the contraband flow created by Porretti himself," upon which Defendants state that an entire argument section is "based," is never mentioned in the facts section and contains no citation to the record. OB 39; *see also*

OB 29 ("If Porretti does indeed continue to trade [Seroquel] as contraband, this now necessarily effects other inmates, and prison security.").

Porretti can only guess that Defendants are referring to a declaration attached to a motion to supplement Defendants' motion for reconsideration of the district court's first preliminary injunction, in which a case worker stated that she observed Porretti acting strangely and then was told by a different prisoner that Porretti hoarded his medication. SER95. This is not appropriate evidence for this Court to consider for several reasons. First, the district court denied Defendants' motion to supplement because the last-minute introduction of this evidence, which contradicted Defendants' earlier claim that "they had no information that Plaintiff had ever abused his medications or misused them as contraband," was not subject to examination by Porretti or the court and therefore its credibility could not be determined. *Id.* Second, the motion to supplement Defendants' motion to reconsider did not even concern the preliminary injunction currently before this Court but instead the court's first injunction ordering medical examinations, which this Court has already held is moot. *Id.* Lastly, this unreliable declaration that is not a part of the record does not even say what Defendants claim it does; there was no finding of guilt, no reference to selling medications, and no mention of "contraband flow." *Id.* Defendants offer no reason for this Court to consider evidence that the district court rejected as not part of the record, which also violates this Court's local rules. Fed.

R. App. P. 28(e) ("A party referring to evidence whose admissibility is in controversy must cite the pages of the appendix or of the transcript at which the evidence was identified, offered, and received or rejected.")

Defendants also make what appear to be new arguments on appeal, such as their *Daubert* argument, or at the very least do not cite where in the district court they purportedly advanced them. *See* Local Rule 28-2.5 ("As to each issue, appellant shall state where in the record on appeal the issue was raised and ruled on and identify the applicable standard of review."). Arguments newly made on appeal are waived. *Orr*, 884 F.3d at 932.

## CONCLUSION

This Court should affirm the district court.

Date: July 30, 2020

/s/ *Samuel Weiss*
Samuel Weiss

RIGHTS BEHIND BARS
416 Florida Avenue NW, #26152
Washington, DC 20001

Jason C. Makris
MAKRIS LEGAL SERVICES, LLC
400 S. 4th Street, Suite 500
Las Vegas, NV 89101

## STATEMENT OF RELATED CASES

Porretti is unaware of any related cases. He does not understand Defendants' Statement of Related Cases, which lists several interlocutory appeals from an unrelated case and says, "It appears that Appellant Thomas may have attempted to file a Fifth appeal in this case which had not been opened." OB 44. Porretti does not know who "Appellant Thomas" is or anything about a "Fifth appeal."

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,504 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word with a Times New Roman 14-point font.

Date: July 30, 2020

*/s/ Samuel Weiss*
Samuel Weiss

RIGHTS BEHIND BARS
416 Florida Avenue NW, #26152
Washington, DC 20001

**CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2020, I electronically filed the foregoing with

the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit

by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by

the appellate CM/ECF system.

Date: July 30, 2020


/s/ Samuel Weiss
Samuel Weiss

RIGHTS BEHIND BARS
416 Florida Avenue NW, #26152
Washington, DC 20001